Revised August 13, 2002

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 01-20793

---

JAMES H. WESTMORELAND,

Plaintiff-Appellant,

versus

ROLAND J. SADOUX, ET AL,

Defendants,

ROLAND J. SADOUX,

Defendant-Appellee.

---

Appeal from the United States District Court
for the Southern District of Texas

---

July 18, 2002

Before HIGGINBOTHAM, WIENER, and BENAVIDES, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

James Westmoreland appeals the district court's grant of Roland Sadoux's motion to compel arbitration and stay further proceedings pending arbitration. Responding to the claim that Sadoux and co-defendant Jan Hendrickx induced Westmoreland to sell his minority shares in a company in which they controlled the remaining 93 percent, Sadoux persuaded the district court to stay the suit and compel arbitration, although defendants were not parties to any agreement to arbitrate. Plaintiff and the two

entities who owned the 93 percent, which were in turn owned by Sadoux and Hendrickx, were parties to a shareholder agreement regarding the securities. We are persuaded that because this suit does not seek to enforce any duty arising out of the shareholder agreement and seeks no relief that would frustrate any right to arbitration under it, Sadoux has no right to compel arbitration. We lift the stay and vacate the order compelling arbitration and remand for further proceedings.

I

Aston Holdings was incorporated under the laws of Aruba to own and operate Dominicana Sanitary Services. Dominicana had a contract with the city of Santo Domingo to collect and dispose of waste. On the formation of Aston, James Westmoreland, Pentrade Limited, T.D.C. Trade Development Company, and Angel Action executed a shareholder's agreement. After Action sold its shares to T.D.C. and Pentrade, Westmoreland owned seven percent of Aston, while Pentrade and TDC each owned 46.5 percent. Their shareholders' agreement included an arbitration clause providing for binding arbitration in Paris, France. Sadoux is the sole owner of Pentrade and his co-defendant Jan Hendrickx is the sole owner of TDC.

Westmoreland alleges that Sadoux and Hendrickx, who controlled the day-to-day operations of Aston, lied to him about its success, telling him that Aston was struggling and that the Dominican government was planning to cancel the Santo Domingo garbage contract; that relying upon these lies he sold his stock to them

for $245,000. Two months later Sadoux and Hendrickx sold Aston for $14,000,000. This suit for fraud is against Sadoux and Hendrickx in their individual capacity. We have appellate jurisdiction under 28 U.S.C. § 1292(b), pursuant to the district court's certification of its order for interlocutory appeal.

II

As a preliminary matter, Sadoux argues that Westmoreland did not claim below that he was unable to enforce the arbitration clause against Westmoreland, and has thus waived the argument. Westmoreland, in his response to Sadoux's motion to compel arbitration, argued that "the parties have not agreed to arbitrating this dispute." The district court initially concluded that Westmoreland conceded that Sadoux is able to enforce the arbitration agreement against him. After a motion by Westmoreland, the district court recognized his contention and entered a separate order discussing the issue at length. It then certified its ruling under Section 1292(b). In short, Westmoreland did not waive this argument below.

Preliminary matters aside, we now turn to the question of whether Sadoux could compel arbitration even though he was not party to an arbitration agreement. We have frequently said that arbitration clauses are to be broadly read to implement Congressional policy expressed in the Federal Arbitration Act and the Convention on the Recognition and Enforcement of Foreign

3

Arbitral Awards.[1] This congressional policy is not intended to discourage the use of American courts. And they facilitate private dispute resolution by remaining open to enforce awards. Indeed, it bears emphasis that the utility of private disputes here depends heavily on access to the public courts for enforcement of the arbitral award. The point is that this twining of private and public fora facilitates the private choices of the market by enforcing only the expectation of parties captured in their contracts.[2]

It signifies that we will read the reach of an arbitration agreement between parties broadly, but that is a different matter from the question of who may invoke its protections. An agreement to arbitrate is a waiver of valuable rights that are both personal to the parties and important to the open character of our state and federal judicial systems–an openness this country has been committed to from its inception. It is then not surprising that to be enforceable, an arbitration clause must be in writing and signed by the party invoking it.[3]

---

[1] *See, e.g.*, *Pennzoil Exploration and Production Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1068 (5th Cir. 1998).

[2] *See E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 762 (2002) (noting that the FAA "ensures the enforceability of private agreements to arbitrate, but otherwise does not purport to place any restriction on a nonparty's choice of a judicial forum.").

[3] *Rojas v. TK Communications, Inc.*, 87 F.3d 745, 748 (5th Cir. 1996) (observing that the "FAA requires that the arbitration clause being enforced be in writing.").

Categories of dispute that cannot exit the public court houses aside, it is well and good if the parties to a private agreement wish to choose an alternative dispute system, but we are wary of choices imposed after the dispute has arisen and the bargain has long since been struck. And hence we will allow a nonsignatory to invoke an arbitration agreement only in rare circumstances.[4]

We have sustained orders compelling persons who have agreed to arbitrate disputes when the party invoking the clause is a nonsignatory, but only when the party ordered to arbitrate has agreed to arbitrate disputes arising out of a contract and is suing in reliance upon that contract.[5] This flex in application of these broadly stated principles rests upon our accepting the doctrine of equitable estoppel as effective in preserving the distinctions between broad readings of the reach of an arbitration clause and our formal insistence upon confining the obligations to the parties of the contract.[6] Even then we have been cautious.

Sadoux says he can invoke the arbitration agreement between

---

[4] *See Hill v. G.E. Power Systems, Inc.*, 282 F.3d 343, 347–49 (5th Cir. 2002) (outlining the limited circumstances under which a nonsignatory can invoke an arbitration agreement).

[5] *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 531 (5th Cir. 2000) (upholding the use of equitable estoppel to compel arbitration where the claims were "intertwined with, and dependent upon" the agreement containing a broad arbitration clause).

[6] *Id*. at 528 (noting that "arbitration is a matter of contract" and thus and cannot, in general, be required for a matter involving an arbitration agreement non-signatory.")

Westmoreland and Pentrade because he acted as an agent for Pentrade, pointing to the Third Circuit's decision in *Pritzker v. Merrill Lynch*.[7] The district court cited *Pritzker* in its order. It held that agents of signatories to an arbitration clause can invoke the clause because under "traditional agency theory, [the agent] is subject to contractual provisions to which [the principal] is bound."[8] The Third Circuit concluded that this is enough to hold that a signatory's "agents, employees, and representatives are also covered under the terms of such agreements."[9]

*Pritzker* is in tension with decisions of the First and Ninth Circuits, which conclude that an agent or employee of a signatory cannot invoke an arbitration clause unless the parties intended to bring them into the arbitral tent. The First Circuit's decision in *McCarthy v. Azure* argued against a broad reading of *Pritzker* and held that an "overt indication that the parties intended to commit claims against" the agent "as an individual" is required in order to permit a nonsignatory agent of a signatory to invoke an arbitration clause.[10] The First Circuit stressed that the distinction between individual capacity and representative capacity is "a meaningful legal difference" and called upon parties to act

---

[7] 7 F.3d 1110 (3d Cir. 1993).

[8] *Id*. at 1111.

[9] *Id*.

[10] *McCarthy v. Azure*, 22 F.3d 351, 356 (1st Cir. 1994).

"before, rather than after, the fact" and rely on "skillful drafting of contract documents" instead of "judicial juggling."[11] Similarly, the Ninth Circuit held, in *Britton v. Co-Op Banking Group*,[12] that a nonsignatory agent, officer, and employee of a signatory could not compel arbitration.[13] The key question, in the Ninth Circuit's view, was whether the wrongdoing arose from a provision or interpretation of the contract containing the arbitration clause.[14]

The Fourth Circuit's recent decision in *Long v. Silver*,[15] which Sadoux also relies upon, offers him little aid. Although *Long* permitted an agent and shareholder to compel arbitration even though they were nonsignatories, it did not adopt *Pritzker*'s sweeping holding that agency is enough. Rather, the Fourth Circuit relied on the fact that the plaintiff invoked other provisions of the arbitral agreement in making his claims against the defendants. It observed that a plaintiff cannot invoke an agreement and claim the benefit of his status under it while attempting to escape its consequences.[16] This parallels our reasoning in *Grigson v. Creative*

---

[11] *Id*. at 360.

[12] 4 F.3d 742 (9th Cir. 1993).

[13] *Id*. at 748.

[14] *Id*. at 747.

[15] 248 F.3d 309 (4th Cir. 2001).

[16] *Id*. at 320-21.

*Artists Agency*, where we permitted a nonsignatory to compel arbitration, on an equitable estoppel theory, when the signatory relies upon the terms of the written agreement to state its claims.[17]

In sum, we agree with the First and Ninth Circuits that a nonsignatory cannot compel arbitration merely because he is an agent of one of the signatories. An agent is not ordinarily liable under the contract he executes on behalf of his principal, so long as his agency is disclosed, but he is personally liable if his acts breach an independent duty.[18] If he seeks to compel arbitration, he is subject to the same equitable estoppel framework left to other nonsignatories. It is to this framework that we now turn.

There are two circumstances under which a nonsignatory can compel arbitration.[19] First, when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory. Second, when the signatory to the contract containing a arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.[20]

---

[17] *Grigson*, 210 F.3d at 527.

[18] *See* RESTATEMENT (SECOND) OF AGENCY § 320 (1958).

[19] *Hill*, 282 F.3d at 348.

[20] *Id.*

Westmoreland's suit does not rely upon the terms of the shareholder agreement or seek to enforce any duty created by the agreement, and there is no allegation that Sadoux acted in concert with anyone. Both Sadoux and Hendrickx elected to interpose liability insulating entities between themselves and Westmoreland. For reasons advantageous to themselves they were not parties to the shareholder agreement. And they did not negotiate an arbitration agreement regarding their personal claims and liabilities. This was no small matter. It gave them access to the courts for any claim they may have had against Westmoreland, subject to the limitation that they would have had to confront the arbitration agreement if they attempted to enforce the terms of that agreement.

These vital distinctions cannot be maintained by simply deploying the standard that the reach of arbitration clauses is to be read broadly, to the distinct problems of their applicability to nonsignatories. Directly put, the courts must not offer contracts to arbitrate to parties who failed to negotiate them before trouble arrives. To do so frustrates the ability of persons to settle their affairs against a predictable backdrop of legal rules–the cardinal prerequisite to all dispute resolution.

VACATED AND REMANDED.